# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO: 3:03CV374

| | |
|---|---|
| ELMER HANSEN, )<br>   Plaintiff )<br>vs. )<br>   )<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>   Defendant. )<br>_____ ) | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER IS BEFORE THE COURT** on Elmer Hansen's "Motion for Summary Judgment and Memorandum in Support" (Document No. 12), filed October 23, 2003, and the Commissioner's "Motion for Summary Judgment" (Document No. 13) and "Memorandum in Support of the Commissioner's Decision" (Document No. 14), filed December 16, 2003. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Commissioner's decision to deny Mr. Hansen's Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will respectfully recommend that Mr. Hansen's Motion for Summary Judgment be <u>denied</u>, and that the Commissioner's Motion for Summary Judgment be <u>granted</u> and her decision <u>affirmed</u>.

## I. PROCEDURAL HISTORY

On July 9, 1996, Mr. Hansen applied for a period of disability and disability insurance benefits, alleging that he became disabled on March 2, 1995 as a result of carpal tunnel syndrome

1



in his right hand. (R. 71-73.)  Mr. Hansen's claim was denied initially and then again on reconsideration. (R. 4-5.) Mr. Hansen filed a complaint in this Court and on October 12, 1999 Magistrate Judge Carl Horn prepared a memorandum and recommendation for Judge Graham Mullen recommending that Judge Mullen deny Plaintiff's Motion for Summary Judgment, grant the Commissioner's Motion for Summary Judgment and affirm the Commissioner's decision. Mr. Hansen objected to Judge Horn's recommendation. The Government did not respond to Mr. Hansen's objections. Without the assistance of briefing from the Government, Judge Mullen remanded the case on March 16, 2000 "to determine if there was a period of five months in which Plaintiff was disabled under the Act, which would then trigger the trial work period." (R. 275.)

Pursuant to the remand, a second hearing was held before the Administrative Law Judge ("ALJ") on November 16, 2001. (R. 348-385.) On February 20, 2002, the ALJ denied Mr. Hansen's claim for benefits, concluding that Mr. Hansen was not under a disability as defined in the Social Security Act at any time through the date of his decision. (R. 257-268.) The Appeals Council denied Mr. Hansen's request for review (R. 235-236), making the hearing decision the final decision of the Commissioner.

Mr. Hansen filed this action on July 25, 2003 and the parties' cross-motions for summary judgment are now ripe for this Court's consideration.

## II. FACTUAL BACKGROUND [1]

During the initial July 14, 1997 hearing on his disability benefits application, Mr. Hansen, then forty-five years old, testified that he had finished high school and was close to completing an

---

[1] This Court takes the underlying facts largely from Judge Horn's Memorandum and Recommendation filed on October 12, 1999 in case number 3:99cv102.

2

associate's degree; had worked for over twenty years as a welder; and had been out of work from March 2, 1995 through approximately March 1996 due to carpal tunnel syndrome. (R. 32-33; 35-36.) He also indicated that in March 1996, he had begun working as a part-time welding instructor at Central Piedmont Community College ("CPCC"); that he worked approximately 18 to 20 hours per week in this capacity; and that he was paid $19.56 per hour for instructional time and $9.07 per hour for each hour he spent facilitating the welding lab. (R. 33-34.)

Regarding his medical condition, Mr. Hansen testified that he had begun having pain in his right hand and arm in early March 1995 after he had been assigned to use a new "Pressfit" welding gun; that he was put on "light duty" and given painkillers for a short time, but then terminated on March 22, 1995 after his problems did not improve; that he underwent carpal tunnel release surgery in June 1995; that even since the surgery he had continued to experience pain and numbness in his right hand; that he wore a wrist splint when demonstrating welding techniques for his students at the college; that "doing anything repetitive" and lifting more than 20 pounds bothered his hand and arm; and that he took Tylenol for the pain when he exacerbated his symptoms through overactivity. (R. 36-41.) Mr. Hansen also testified that he had battled depression following his surgery, his incurring of mounting medical bills, and his wife's attempted suicide; that he had been prescribed Paxil and was being treated by a Dr. Daly for this condition; that the Paxil made him drowsy, and therefore he took it only after finishing his teaching for the day; and that he was nonetheless able to work as a welding instructor in spite of this condition. (R. 41-43.)

As to daily activities, Mr. Hansen testified that during the year following his surgery (and before his commencement of work at CPCC), he had spent most of his time at home, watching television and feeling depressed; that he "did the dishes sometimes," but otherwise did "not a whole

3

lot of nothing" in terms of housework; that he had applied and been rejected for a number of jobs; and that with the help of vocational rehabilitation, he had begun pursuing his associate's degree. (R. 43-45.)

A vocational expert, Kathryn Mooney, also testified at this initial hearing. Ms. Mooney characterized Mr. Hansen's work as a welding instructor as light and skilled, his work as a lab facilitator as light and unskilled, and his past experience as a welder as medium to heavy and skilled. She also testified that his skills were transferable only to a medium or heavy job, as most light welding jobs "are for the most part unskilled" and thus Mr. Hansen was overqualified for them, or, in a very few instances, required very high skills beyond Mr. Hansen's level of expertise. (R. 46.)

The ALJ asked Ms. Mooney about possible job opportunities for a person with Mr. Hansen's age, education, skilled work background, "a degree of chronic pain" which was reasonably controlled by medication, and an assumed ability to perform "sedentary" and "light" work as defined in the regulations, subject to the restrictions that he was precluded from "jobs requiring fine dexterity with the right hand and fingers, [and] ... any more than occasional lifting of over ten pounds with the same dominant right hand." (R. 46-47.) In response, Ms. Mooney testified that such a person could find ample nearby work as a furniture rental and storage facility rental clerk, photo finishing counter clerk, park aide, customer service clerk, bus line information clerk, or dispatcher. (R. 47-49.)

On a Disability Report dated June 27, 1996, Mr. Hansen reported that he suffered from "severe CTS"; that he could not work primarily because of the effects of carpal tunnel syndrome (inflammation, pain, and inability to hold onto objects) on his right hand, wrist, and arm; that he took anti-inflammatory medications for his pain; that he had undergone one surgery for carpal tunnel syndrome, and had seen a neurologist, an orthopedist, and a physical therapist for follow up

4

treatment of this condition; that he had been restricted by his doctors from lifting over 15 pounds or performing repetitive motions with his right hand; that he cooked twice per day, cleaned dishes, vacuumed, went grocery shopping, mowed his lawn with a riding mower, drove, and washed his vehicles every two weeks; and that he was able to enjoy walking, listening to music, watching his son play Little League baseball, visiting his father, and going to cook-outs. (R. 75-78.)

On October 8, 1996, Mr. Hansen filed a "Reconsideration Disability Report," on which he represented that the pain and numbness in his right hand were worse; that he was still having elbow and shoulder pain which he could not have addressed because of his poor financial situation; that he had tried to get a number of jobs but had been rejected (as evidenced by a number of rejection letters attached to this report); that he had been given no additional work restrictions; that he was "very stressed and depressed"; that he was able to care for his own needs, but would still "constantly drop things"; and that he was no longer able to do maintenance on his car, play catch with his son, or get along with his spouse. (R. 91-102.)

The medical records submitted to the ALJ established that Mr. Hansen began complaining of severe pain and numbness in his right hand and wrist approximately March 2, 1995. He began seeing doctors shortly thereafter, and was initially placed on light duty. Mr. Hansen was ultimately referred to both a neurologist, Dr. Drake McDonald, and an orthopedist, Dr. John S. Gaul, each of whom diagnosed carpal tunnel syndrome. Dr. Gaul performed carpal tunnel release surgery on Mr. Hansen's right hand on June 27, 1995. (R. 198-99; 201-02; 209.)

Dr. Gaul followed Mr. Hansen's postoperative progress, and noted on August 15, 1995 that Mr. Hansen was "improving," but continued to have some decreased sensation to touch in his thumb and index finger, as well as limited range of motion which was "gradually improving." Dr. Gaul

5

concluded on this date "[o]verall I feel like he is doing quite well on my exam... I feel that he can return to work but should avoid excessive activity of the right hand, and in particular should not lift more than 15 pounds at this time." Mr. Hansen was also referred to physical and occupational therapy for a job analysis and strengthening of his arm and hand. (R. 202-03.) Mr. Hansen received outpatient occupational therapy from July 11 to September 26, 1995. (R. 212-19.)

On September 12, 1995, Mr. Hansen was noted to still have a weak pinch and increased wrist flexion and extension. Dr. Gaul opined on that date:

> ...[H]e is at maximum medical improvement and a work note is written today clarifying what he may and may not do with return to work on 9-27-95. If one handed work was available he could return to work now. I estimate that he has a 10 percent permanent impairment to his hand due to his carpal tunnel syndrome and the residual weakness present.

(R. 203-04.)

Mr. Hansen did not have any further contact with Dr. Gaul's office until a telephone call on January 6, 1996, at which time he reported to a physician's assistant that he was "having increasing pain in his right posterior shoulder and into his wrist" after recently "returning to normal activities over the past several days." The PA advised Mr. Hansen that he could increase the amount of ibuprofen he was taking each day, that the clinic could not call in a narcotic prescription, and that Mr. Hansen should make an appointment with the after-hours clinic if he felt it necessary. (R. 204.)

Dr. Gaul saw Mr. Hansen again on January 9, 1996, at which time he complained of pain in his arm and hand, "radiating... from the upper arm area ... down to the carpal tunnel area," as well as "throbbing and bouncing" in his wrist and thumb. Mr. Hansen indicated that these symptoms might have been brought on by his recent activities, including helping a friend with a "tack gun." Dr. Gaul prescribed an anti-inflammatory medicine and the use of a wrist brace for a few weeks, and

suggested that a nerve conduction study and EMG might be in order if Mr. Hansen's symptoms did not abate. (R. 205.)

Mr. Hansen returned to Dr. Gaul for a final visit on February 5, 1996, after having undergone EMG and nerve conduction studies which showed "mild to moderate carpal tunnel syndrome significantly improved compared to [tests] on 4/17/95." On examination, Mr. Hansen was noted to have soreness along his arm and "good hand grip and strength." Dr. Gaul's impression at that time was that "anti-inflammatory medicines would be best for him to take" and that "he can do some work with this arm, but should not use arm over his head and should not be engaged in repetitive work that does not allow a break occasionally. (R. 205-06.) Dr. Gaul filled out a work release form on that same date, indicating thereon that Mr. Hansen could return to work "when work [was] available"; that he should "avoid repetitive work w/ R hand (can do some data entry etc. but no more than 30 minutes/hour) and avoid lifting objects > 15 lbs. above shoulder level..." (R. 207.)

On August 20, 1996, Mr. Hansen was evaluated consultatively by Harjit G. Mac, MD, an orthopedic surgeon, on behalf of North Carolina Disability Determination Services (NCDDS). Mr. Hansen reported to Dr. Mac that he continued to have persistent pain, numbness, and weakness in his right wrist; that he also had pain in his right shoulder and elbow area "when he tries to use overhead position and while trying 'Pressfit' equipment which he uses in his welding job"; that he took four ibuprofen tablets as needed two to three times a day; that he had "no difficulty sitting, standing, or walking"; that he was able to drive with a "resting wrist splint"; and that he had begun working as a welding instructor but had not worked during the past three months due to a summer layoff. Dr. Mac examined Mr. Hansen and observed that he continued to have some signs of "mild to moderate" carpal tunnel syndrome, as well as "chronic bicipital tendinitis – right shoulder and

7

chronic common extensor tendinitis – right elbow." However, Dr. Mac did not state any opinion as to whether or not Mr. Hansen was disabled. (R. 228-32.)

Mr. Hansen's residual functional capacity was also evaluated by Sankar V.S. Kumar, M.D., on behalf on NCDDS on January 28, 1997. The only work restriction found by Dr. Kumar was that Mr. Hansen should "avoid a lot of repetitive reaching and fine manipulation" with his right arm and hand. (R. 156-63.)

The medical records also indicate that Mr. Hansen was evaluated and treated for some minor psychological and emotional problems in 1996. Specifically, on January 26, 1996, Mr. Hansen underwent a psychological evaluation by Marsha Alexander, a licensed psychological associate. After administering a battery of tests, Ms. Alexander concluded that Mr. Hansen had "the intellectual and academic ability to continue his education if he is motivated to do so, ... good abilities[, and]... some motivation to change his life and look toward the future. " Psychologically, she concluded that Mr. Hansen "seems to have self confidence and good self esteem," that he "ha[d] no strong personality dysfunctioning," and that "many of his problems now seem to stem from his physical complaints and dealing with the stressors in his life..." including his mother's recent death and dealing with Workman's Compensation. (R. 220-227.)

Approximately ten months later, Mr. Hansen was referred by Dr. Gaul to Dr. F. Daly for a psychiatric assessment, which took place on November 27, 1996. At that time, Mr. Hansen reported that his wife had recently attempted suicide, that he had been having difficulties with his hand and arm, and that he had been "having difficulties with decreased mood, anhedonia, feelings of hopelessness, feelings of worthlessness, decreased energy, decreased ability to concentrate, decreased sleep, and increased appetite with a weight gain of 15 pounds over the past six months."

Dr. Daly diagnosed Mr. Hansen with "[m]ajor depression, single episode, moderate" and prescribed Paxil, an anti-depressant. On December 31, 1996, Mr. Hansen returned to Dr. Daly and was noted to be "doing somewhat better" and to demonstrate an improvement in his overall mood, affect, and other symptoms. On January 21, 1997, Dr. Daly opined that Mr. Hansen was "actually doing fairly well at present," that his mood and affect were "relatively bright," and that "[h]is depression is significantly improved." By March 6, 1997, Mr. Hansen was "really doing quite well" with continued improvement in all his symptoms while continuing on Paxil. (R. 233-34.)

In January, 1997, Mr. Hansen underwent a psychiatric and mental residual functional capacity assessment by Jeffrey J. Wysocki, Ph.D., at the behest of NCDDS. Dr. Wysocki found that Mr. Hansen was only "moderately limited" in 3 of the 20 cognitive and psychological areas evaluated, and concluded that Mr. Hansen had only moderate limitations on his activities of daily living and ability to maintain social functioning, but nothing severe enough to render him disabled based on a psychiatric impairment. (R. 143-55.)

During the second hearing on his disability benefits application on November 16, 2001, Mr. Hansen, then forty-nine years old, testified that he obtained an Associates Degree in General Education in 1997. He explained that between March 1995 and May 1995 his duties at Mechanical Industries included "just hanging around the office and go[ing] to doctor's appointments if I had them." (R. 363.) Mr. Hansen testified that he was operated on in June 1995 and attended physical therapy twice a week following the operation. He explained that during this time frame he was depressed and mad because he was unable to work as a welder, which he had done since 1974. (R. 365.) For his depression, he took Paxil, which sometimes made him feel dazed. (R. 365.) Mr. Hansen explained during the time he was in physical therapy he mostly watched television. He did

not participate in any housework. (R. 367.) The ALJ questioned Mr. Hansen as to why he previously stated that he did heavily participate in the housework if his current testimony was that he did not. Mr. Hansen did not give a clear answer to this question but left the impression that he never did perform housework. (R. 374.)

The vocational expert, Kathryn Mooney, testified at the second hearing, essentially giving the same testimony as in the first hearing. The ALJ asked Ms. Mooney about possible job opportunities for a person with Mr. Hansen's age, education, skilled work background and assumed ability to perform sedentary and light work on a sustained basis, limited to jobs requiring only occasional and not frequent or repetitive use of his right hand and arm and taking into account that he was precluded from jobs requiring fine dexterity on a repetitive basis with the right upper extremity and occasional lifting of no more than 10 pounds. (R. 378-79.) Ms. Mooney testified that such a person could find work as a park aide, receptionist, storage facility rental clerk, surveillance system monitor and various non-emergency dispatching jobs. (R. 379-380.) Ms. Mooney further testified that all of the jobs she suggested required some public contact and required the person performing them to be courteous and calm. Ms. Mooney explained that the jobs she suggested were available in North Carolina, but were not unique to North Carolina. (R. 380; 383.)

Following the second hearing, Mr. Hansen's attorney wrote the ALJ two letters, which have been made part of the record, detailing Mr. Hansen's earnings from January 1995 through December 1997. (R. 319-331; 336-337.) Additionally, the ALJ secured and made part of the record a social security computer record showing Mr. Hansen's earnings and employers from 1995 through 2000. (R. 332-335.)

# III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, <u>Richardson v. Perales</u>, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>see also</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In <u>Smith v. Heckler</u>, 782 F.2d 1176, 1179 (4th Cir. 1986), the Fourth Circuit defined "substantial evidence" as

> being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

<u>Id.</u> (quoting <u>Perales</u>, 402 U.S. at 401).

The Fourth Circuit has made clear that it is not for a reviewing court to re-weigh the evidence or to substitute its judgment for that of the Commissioner – so long as that decision is supported by substantial evidence. <u>Hays</u>, 907 F.2d at 1456 (4th Cir. 1990); <u>see also</u> <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the Commissioner, not the courts, to make findings of fact and to resolve conflicts in the evidence. <u>Hays</u>, 907 F.2d at 1456; <u>King v. Califano</u>, 599 F.2d 597, 599 (4th Cir. 1979) ("This court does not find facts or try the case de novo when reviewing disability determinations."); <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistences in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion.") Indeed, so long as the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court disagrees with the final outcome. <u>Lester v. Schweiker</u>, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

Judge Mullen remanded this case to the Social Security Administration to determine "if there was a period of five months in which Plaintiff was disabled under the Act, which would then trigger the trial work period." The ALJ held a remand hearing pursuant to Judge Mullen's order to determine whether Mr. Hansen's condition met the Social Security Administration's criteria for "disability" at any time as that term is defined for Social Security purposes.[2] The ALJ considered all of the evidence presented and found after the hearing that there was evidence that Mr. Hansen engaged in substantial gainful activity from prior to March 2, 1995 through May 22, 1995, from April through June 1996, from October 1996 through August 1997, from October 1997 through December 1998, and from January 2000 through August 2001[3]; Mr. Hansen has "severe' right carpal tunnel syndrome; Mr. Hansen does not have an impairment or combination of impairments listed in Appendix 1, Subpart P, Regulations No. 4; Mr. Hansen regained the residual functional capacity to perform "light" and "sedentary" work within five months of the date he stopped working; Mr.

---

[2] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term disability is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). The twelve month durational requirement was upheld by the Supreme Court in Barnhart v. Walton, 523 U.S. 212 (2002).

[3] However, the ALJ noted that if Mr. Hansen established that be became disabled on May 22, 1995, the date he last worked at Mechanical Industries, his work could be characterized as trial work or work performed during an extended period of entitlement. Walton v. Apfel, 235 F.3d 184 (4th Cir. 2000). The ALJ gave Mr. Hansen the benefit of the doubt on the substantial gainful activity issue, and went on to evaluate whether Mr. Hansen was disabled by applying the remaining elements of the sequential evaluation process. The Court notes that the case the ALJ cited in support of the potential "trial work" period has been reversed by the Supreme Court. Barnhardt v. Walton, 535 U.S. 212 (2002).

Hansen could not perform his past relevant work; and Mr. Hansen is capable of making the adjustment to work which exists in significant numbers in the national economy.

The ALJ used the appropriate five step sequential evaluation process in determining that Mr. Hansen was not disabled. Mr. Hansen spends pages of his motion arguing that the ALJ incorrectly classified periods of his work history as substantial gainful activity. The ALJ, however, did not base his decision that Mr. Hansen was not disabled on the substantial gainful activity component of the sequential evaluation process. Instead, he went on to the remaining four steps of the sequential evaluation process and determined that Mr. Hansen was not disabled based on his ability to perform jobs consistent with his impairment. (R. 263, 267.) Thus, in this case, whether Mr. Hansen's return to work in March 1996 constituted "substantial gainful activity" is immaterial. However, given the drawn out history of this case, the Court will consider all of Mr. Hansen's arguments.

## Substantial Gainful Activity

### March 2, 1995 through May 22, 1995

Mr. Hansen challenges the characterization by the ALJ of several time periods as substantial gainful activity[4]. The first period Mr. Hansen challenges is March 2, 1995, the date his disability allegedly began, through May 22, 1995, the date he was terminated from his job at Mechanical Industries. Mr. Hansen contends that during this three month period he was not actually working, but was, according to his employers instructions, "hang[ing] around [to] see what you can do." (R. 363.) He contends that during this period his employer and its insurance company were deciding whether to pay him workers compensation and that, while he was earning a salary, that fact alone

---

[4] Substantial gainful activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a)(2003).

does not establish that he was engaged in work activities. The Commissioner contends that the ALJ properly evaluated this time period as substantial gainful activity based on Mr. Hansen's own statements to the Administration, to his doctor, and on his worker's compensation settlement agreement, in addition to the fact that Mr. Hansen's earnings exceeding five hundred dollars per month.

There was significant evidence before the ALJ that Mr. Hansen was performing substantial gainful activity from March 22, 1995 through May 22, 1995. First, Mr. Hansen noted on his disability report that he worked as a pipe welder from September 1994 through May 1995, and while he was put on light duty beginning March 2, 1995, he did not stop working until May 22, 1995. (R. 75, 79, 261.) Next, Mr. Hansen reported to Dr. Mac, a consulting physician, that he remained on light duty work for two months and only stopped working when there was no longer any light work available. (R. 229, 261.) The ALJ also considered Mr. Hansen's workers compensation settlement agreement where he stated that he became disabled on June 1, 1995. Finally, the ALJ considered Mr. Hansen's earnings record which showed that his earnings were above the level the regulations set as constituting substantial gainful activity.[5] (R. 313-315.)

Mr. Hansen concedes that he was earning income over the $500.00 limit, but argues that he was not working a "real job" and was not capable of performing "substantial work." Mr. Hansen did not provide any objective evidence that he was unable to work during this period. In fact, the only evidence Mr. Hansen provided to support this claim is his own testimony. However, the ALJ found Mr. Hansen's testimony unpersuasive. (R. 267.)

---

[5] From January 1990 through June 1999, if a claimant earned five hundred dollars in a month, that was viewed as earnings that demonstrated that he had engaged in substantial gainful activities. 20 C.F.R. § 404.1574(b)(2)(i), Table 1 (2003).

Based on the above-stated evidence, there was substantial evidence before the ALJ to find that Mr. Hansen was engaged in substantial gainful activity during the period between March 2, 1995 and May 22, 1995.

**May 22, 1995 through March 1996**

The next period Mr. Hansen challenges is May 22, 1995 through March 1996. However, the ALJ did not find that Mr. Hansen was engaged in substantial gainful activity during this period. Therefore the ALJ did not improperly characterize this time period as one in which Mr. Hansen was engaged in substantial gainful activity.

**April 1996 through November 1996**

The next period Mr. Hansen challenges is April 1996 though November 1996. Mr. Hansen conceded that he began work as a laboratory set up person and assistant in welding instruction at CPCC after March 1996, but argues that his work at CPCC should not be considered substantial gainful activity because he was terminated from his position for not being able to perform his job effectively, he was unable to interact with the public, he performed his position in a situation similar to a sheltered work environment, and his earnings did not rise to the level of substantial gainful activity when taking into account his transportation expenses. The Commissioner contends that Mr. Hansen's arguments are not supported by the evidence.

The evidence before the ALJ indicates that Mr. Hansen was performing substantial gainful activity during this period. First, Mr. Hansen's attorney admitted his client was working at CPCC between April and November 1996 in a letter to the ALJ. (R. 303-304.) Mr. Hansen's pay stubs from CPCC demonstrate that he was performing substantial gainful activity as defined by the regulations as he earned $561.73 in April and May, $714.93 in June, and $772.42 in October and

November 1996. (R. 307-308.) There is no evidence in the record to support Mr. Hansen's claim that he was fired from CPCC for not effectively doing his job or for inability to interact with the public. In fact, the ALJ considered whether Mr. Hansen's work activity during this period could be construed as an unsuccessful work attempt, but concluded that it could not because the break in his work activity at CPCC from July to October 1996 was caused by the end of the semester and not by a worsening of his medical condition. (R. 262.) Mr. Hansen testified that one of his duties as a welding instructor was talking to people about welding, which his pay stubs indicate he was able to do in April, May, June, October and November 1996. (R. 307-308, 368.)

Mr. Hansen's argument that his work was performed in an environment akin to a sheltered work situation is also not supported by the evidence. The Social Security regulations state that sheltered employment is a position in a protected environment under an institutional program. 20 C.F.R. § 404.1574(b)(4)(2003). Internal agency policy further defines a sheltered workshop as a charitable institution or organization that is considered not for profit and exists for the purpose of rehabilitating handicapped workers. Program Operations Manual System § RS 02101.270. Mr. Hansen's position as an assistant in welding instruction does not appear to meet the definition of sheltered work environment.

Last, Mr. Hansen claims that his work activity during this time was incorrectly evaluated because his earnings did not constitute substantial gainful activity when his transportation costs are deducted. The Commissioner contends that Mr. Hansen's travel expenses are not deductible work-related expenses.

The Social Security regulations provide that certain transportation costs will be deducted from a claimant's earnings to determine whether he has performed work that constitutes substantial

16

gainful activity. Pursuant to 20 C.F.R. § 404.1576(c)(6)(iii), only transportation costs associated with the following situations will be deducted from an individual's earnings to determine substantial gainful activity: 1) where a claimant's impairment requires that in order for him to get to work he needs a vehicle that has structural or operational modifications; 2) where a claimant's impairment requires that he use driver assistance, taxis or other hired vehicles in order to work; and 3) where a claimant's impairment prevents him from taking public transportation to and from work and he must drive an unmodified car to work.

In this case, Mr. Hansen made no showing that his transportation expenses met any of the above-listed factors, and thus his transportation expenses were properly not deducted from his earnings and the ALJ's determination that he engaged in substantial gainful activity from April through November 1996 was supported by substantial evidence.

### Residual Functional Capacity

Mr. Hansen contends that the ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence because the ALJ failed to consider the opinions of Drs. Layton and Hendler and the state agency decision finding him disabled[6] and the ALJ failed to consider the credibility of Mr. Hansen regarding his own mental condition. The Commissioner contends that the ALJ based Mr. Hansen's RFC determination on the medical findings from treating, examining and non-examining physicians, giving the most weight to Dr. Gaul's opinion, and that the ALJ specifically found Mr. Hansen's testimony not persuasive.

The Social Security regulations define "residual functional capacity" as "what [a claimant]

---

[6] Mr. Hansen's attorney withdrew this argument after discovering he mistakenly included it in his motion. Therefore, the Court will disregard this argument.

can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to

"first assess the nature and extent of [the claimant's] physical limitations and then determine [the

claimant's] residual functional capacity for work activity on a regular and continuing basis." 20

C.F.R. § 404.1545(b).

Mr. Hansen claims that the ALJ did not consider his credibility regarding his own mental

condition. The determination of whether a person is disabled by non-exertional pain or other

symptoms is a two-step process. "First, there must be objective medical evidence showing the

existence of a medical impairment which results from anatomical, physiological, or psychological

abnormalities and which could reasonably be expected to produce the pain or other symptoms

alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996) (citing 20 C.F.R. § 416.929(b), §

404.1529(b); 42 U.S.C. § 423(d)(5)(A)). If there is such evidence, then the ALJ must evaluate "the

intensity and persistence of the claimant's pain, and the extent to which it affects his ability to work."

Id. at 595 (citing 20 C.F.R. § 416.929(c)(1), § 404.1529(c)(1)). The regulations provide that this

evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence,"
> including the claimant's medical history, medical signs, and laboratory findings; any
> objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasm,
> deteriorating tissue, redness, etc.); and any other evidence relevant to the severity of the
> impairment, such as evidence of the claimant's daily activities, specific descriptions of the
> pain, and any medical treatment taken to alleviate it.

Id. (Citations omitted).

When determining whether Mr. Hansen's statements are credible, the ALJ must evaluate the

medical signs and laboratory findings, any diagnosis, prognosis or other medical opinions and "any

statements/reports from Plaintiff or treating or examining physicians/psychologists about his medical

history . . . ". <u>Social Security Ruling (SSR)</u> 96-7p. In making credibility determinations, the ALJ also considers the consistency of the Plaintiff's statements, any medical treatment and history and any observations of him by the Administration. <u>Id</u>. Here, the ALJ reviewed the evidence as required under the regulations and found that Mr. Hansen's testimony was not persuasive. (R. 267.)

A comparison of Mr. Hansen's complaints with the evidence before the ALJ supports the ALJ's credibility determination. During the time Mr. Hansen claimed he was disabled, vocational rehabilitation assisted him in obtaining an Associate's Degree in General Education in 1997 (R. 354), he worked at Batteries Plus forty hours a week (R. 358), and he was employed as a maintenance welder from October 2000 until August 2001. (R. 355-356.) Mr. Hansen reported that Dr. Gaul told him not to return to work as a welder, but after he was released to work in September 1995, he only looked for a position as a welder and not in any other area of employment. (R. 365, 376.) Mr. Hansen indicated that he was only taking Tylenol and Ibuprofen for pain. (R. 373.) Additionally, Mr. Hansen noted in his Disability Report in June 1996 that he cooked twice a day, cleaned dishes, vacuumed, went grocery shopping, used a riding mower and washed his vehicle every two weeks. (R. 78.) Yet, at the hearing, Mr. Hansen testified that he did not perform any of the housework and seemed to indicate that he never had. (R. 366.)

A review of the evidence thus indicates that the ALJ did consider Mr. Hansen's testimony, but found that it was not fully credible. The ALJ's RFC determination, including his credibility determination, is supported by substantial evidence.

## Other Work In The National Economy

Mr. Hansen claims that he could not perform any of the jobs suggested by the vocational expert because he was unable to engage in contact with the public, unable to control his anger and

unable to communicate. The Commissioner contends that there is no evidence in the record to support Mr. Hansen's alleged limitations.

Once Mr. Hansen demonstrated that he could not perform his prior relevant work, the ALJ properly shifted the burden to the Commissioner to establish that there are other jobs that Mr. Hansen could perform taking into account his age, education, work experience and mental/physical limitations. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993). The ALJ found that Mr. Hansen was 49 years old at the time of the administrative hearing, had a high school education, no transferable skills and a residual functional capacity for light and sedentary work. (R. 266.) The ALJ then based his determination that Mr. Hansen could perform jobs consistent with his impairment on testimony from the vocational expert who testified that Mr. Hansen could work as a park aide, storage rental clerk, non-emergency dispatcher and surveillance system monitor. (R. 266.)

Mr. Hansen testified that he was terminated from his position as a maintenance mechanic welder in August 2001 due to his employer's perception of his physical condition, not because he was unable to control his anger or to communicate with others. (R. 355.) Mr. Hansen testified that CPCC hired him in April 1996 and then rehired him in October 1996 where he worked through July 1997. (R. 307 - 311.) This work history with CPCC indicates Mr. Hansen was able to perform his job which included communicating with his students. He testified that the reason he was terminated from CPCC was because of his poor dexterity, not due to his inability to communicate with the students. (R. 364.) Mr. Hansen testified that he was depressed and taking Paxil for that diagnosis. (R. 361.) During this time he described himself as "depressed and pissed off." (R. 368.) While there is clear testimony that Mr. Hansen was depressed following his surgery, he has not presented

any evidence that he was unable to perform the jobs identified by the vocational expert. The vocational expert testified that none of the jobs she described involved any intense interaction with the public, but that they all require a person to be courteous and calm. (R. 381.) There was no testimony or evidence in the record that described Mr. Hansen as out of control or unable to control his anger such that he should not be permitted to interact with the public. Therefore the ALJ's determination that Mr. Hansen could perform jobs consistent with his impairment is supported by the evidence before the ALJ.

Mr. Hansen further contends that even if he could perform the jobs suggested by the vocational expert, none of the jobs exist in substantial numbers in the economy and that there was no showing that he could reach any of these jobs from his home. The vocational expert testified that in North Carolina there are approximately 1,190 unskilled positions, such as receptionist type work, there are approximately 400 storage facility rental clerk positions, and that this was a growing field, and there are about 826 sedentary jobs, such as surveillance system monitor and non-emergency dispatching jobs. (R. 379-380.) While she mentioned that the numbers provided were for the State of North Carolina, she also explained that these positions could also be found in Charlotte, in fewer numbers than the entire state, and that the jobs were not unique to North Carolina. (R. 380, 383.) Based on this evidence, there was substantial evidence before the ALJ to find that these jobs were available in the national and local economy.

## A Trial Work Period Is Inapplicable [7]

Mr. Hansen contends that beginning in November 1996, he began a nine month trial work

---

[7] As stated above, Judge Mullen remanded this matter "to determine if there was a period of five months in which Plaintiff was disabled under the Act, which would then trigger the trial work period."

effort which ended in August 1996. The Commissioner contends that a trial work period is inapplicable in Mr. Hansen's case because he was only seeking a period of disability and he returned to work within twelve months of his impairment. A trial work period is a period of time during which a claimant may attempt to work but is still considered disabled. 20 C.F.R. § 404.1592(a) (2003). In order for a claimant to be eligible for a trial work period, there must first have been a determination that he was entitled to disability benefits. 42 U.S.C. § 422(c)(1). A claimant is not entitled to a trial work period if he has returned to work within twelve months of the impairment and before the date of any notice of determination or decision finding him disabled. 20 C.F.R. § 404.1592(d)(2) (2001). Additionally, a claimant will not be found to be entitled to a trial work period if he was only found to be entitled to a period of disability. 20 C.F.R. § 404.1592(d)(2)(i) (2003). Mr. Hansen, by his own admission, was only disabled from March 1995 through November 1996, and therefore was only seeking a period of disability. A trial work period is inapplicable to Mr. Hansen's situation, as he returned to work within twelve months of his impairment and before a determination that he was disabled and he was only seeking a period of disability. Therefore, a trial work period is inapplicable to Mr. Hansen's case.

## IV. RECOMMENDATIONS

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Mr. Hansen's Motion for Summary Judgment (Document No. 12) be **DENIED**; that the Commissioner's Motion for Summary Judgment (Document No. 13) be **GRANTED**, and that the Commissioner's determination be **AFFIRMED**.

## V. NOTICE OF APPELLATE RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections

to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed with in ten (10) days after service of the same. Snyder v Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rive, 741 F.Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Graham C. Mullen.

**SO RECOMMENDED AND ORDERED,** this 14th day of January, 2005.

DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE

23

United States District Court
for the
Western District of North Carolina
January 14, 2005

* * MAILING CERTIFICATE OF CLERK * *

Re:  3:03-cv-00374


True and correct copies of the attached were mailed by the clerk to the
following:

        James M. Sullivan, Esq.
        U.S. Attorney's Office
        227 W. Trade St.
        1700 Carillon Bldg.
        Charlotte, NC  28202

        Shelley Blum, Esq.
        220 Aaron's Branch Rd.
        Bakersville, NC  28705



cc:
Judge _MULLEN_           (✓)
Magistrate Judge         ( )
U.S. Marshal             ( )
Probation                ( )
U.S. Attorney            ( )
Atty. for Deft.          ( )
Defendant                ( )
Warden                   ( )
Bureau of Prisons        ( )
Court Reporter           ( )
Courtroom Deputy         ( )
Orig-Security            ( )
Bankruptcy Clerk's Ofc.  ( )
Other_____     ( )


                                    Frank G. Johns, Clerk

        Date: _1-14-05_             By: _____
                                        Deputy Clerk